[Filed March 5, 1890.]

STATE OF OREGON, RESPONDENT, *v.* A. J. CODY, APPELLANT.

MAYHEM—EVIDENCE NECESSARY TO CONVICT.—In order to justify a conviction under ¿ 1735, Oregon Code of Crimes and Punishments, which provides, among other things, that "if any person shall purposely and maliciously, or in the commission or attempt to commit a felony, cut, slit or mutilate the nose or lip, etc., of another, such person shall be punished by imprisonment in the penitentiary not less than one nor more than twenty years."    The evidence must show beyond a reasonable doubt that the accused did the cutting, slitting or mutilation purposely, deliberately and designedly, unless done in the commission or attempt to commit a felony.

MAYHEM—CASE IN JUDGMENT.—Where the accused in a criminal prosecution was charged with having purposely and maliciously cut, slit and mutilated the lip of

M. contrary to the provisions of the section of the Code above referred to, and it appeared from the evidence given at the trial that in a fight between the accused and M., which arose out of a sudden heat of passion, the tissue of the inner lining of M.'s lower lip was lacerated and a piece thereof taken out, leaving a wound testified to as being about three-fourths of an inch long, a half of an inch wide, and a fourth of an inch deep, which M. testified was done by the accused biting the lip during the fight; that the wound at the time of the trial had healed over, leaving, however, a visible scar; that the fight was a hand-to-hand affair, in which no weapons were employed; but it did not appear from the evidence that the injury to the lip was specially intended, or inflicted otherwise than as incidental to the fight; *held,* that the evidence was not sufficient to authorize the conviction of the accused of the crime as charged in the indictment.

INSTRUCTIONS—DUTY OF TRIAL COURT.—It is the duty of a trial court to instruct the jury in a criminal prosecution, where the offense charged necessarily includes a lesser offense, that they have a right to find the accused guilty of the latter where there is a doubt as to his guilt of the former; and where it appears from the record that the instruction was not given in such a case, *held* (per THAYER, C. J.), that it was error which the accused could take advantage of upon appeal without having interposed any exception; *held, further,* that the accused in a criminal prosecution does not waive an error committed by a trial court in neglecting the performance of a duty enjoined upon it by law, and which it is required to perform of its own motion, by his failing to call the attention of the court to the fact, or by his not excepting to the matter of neglect.

APPEAL from a judgment of conviction of the appellant, rendered by the circuit court for the county of Multnomah, for an alleged crime.

The appellant was indicted in said court for feloniously cutting, slitting and mutilating the lip of one Joseph Morin. He pleaded not guilty to the indictment, was tried thereon by jury, found guilty as charged, and sentenced to imprisonment in the penitentiary of the State for one year. From which sentence this appeal was taken.

The facts of the case appear in the opinion of the court.

*A. F. Sears, Jr.,* and *F. D. Winton,* for Appellant.

*Henry E. McGinn,* District Attorney, for Respondent.

THAYER, C. J.—The appellant was indicted under section 1735, Code of Crimes and Punishments, which reads as follows: "If any person shall purposely and maliciously, or in the commission or attempt to commit a felony, cut or tear out or disable the tongue, put out or destroy the eye, cut or slit or tear off an ear, cut or slit or mutilate the nose or lip, or cut off or disable the limb or member of another, such person, upon conviction thereof, shall be punished by imprisonment in the penitentiary for not less

than one nor more than twenty years." A demurrer was interposed to the indictment, which the circuit court overruled, and the appellant thereupon pleaded not guilty. A trial was then had, which resulted in the appellant's conviction of the crime as charged; and from which he has appealed to this court, and assigned several grounds of error, upon which he relies on the appeal. One of the grounds is that the evidence in the case was not sufficient in law to authorize the conviction. This raises an important question for our consideration, involving a construction of said statute.

It appears that after the evidence was closed, the appellant's counsel moved the court that, upon all the testimony in the case, it direct a verdict for the appellant, and that he be discharged; or, that the court instruct the jury that the appellant could not be convicted of the crime of mayhem, for that the evidence was insufficient to justify the same, and that the indictment failed to charge any facts constituting such offense. That the court refused to allow said motion, and to make said order, or any part thereof; and to which the appellant's counsel excepted. That the court, in its instructions to the jury, among others charged that if a person with the teeth should cut, slit or mutilate the lip of another, that would make it mayhem under said section of the statute. That that was a question of fact for the jury to determine under the law and the evidence as it had been submitted to them, as to whether or not the appellant was guilty of the crime. To this charge of the court the appellant's counsel excepted, upon the ground that the court failed to instruct the jury that the evidence was insufficient to justify a conviction of the crime of mayhem, attempted to be charged in the indictment, and that the facts therein stated failed to constitute such crime. The bill of exceptions purports to contain all the evidence in the case, and hence the point of the said exception is fairly presented. The evidence shows that the alleged cutting, slitting and mutilation occurred in a fight between the appellant and the said

Joseph Morin, which took place at the Holton House, in Portland, on the sixteenth day of March, 1889, the time charged in the indictment as the time of the commission of the offense.    It appears that said parties at said time were employés at the Holton House; that appellant had been employed there for more than three years as runner, and that Morin had been employed there about six months as a porter; that upon the occasion referred to the appellant accused Morin with having slapped the bell-boy, and that the parties immediately engaged in the fight.  The evidence is conflicting as to which of them began it, each claiming that the other struck the first blow.

Morin testified that he came into the office and was sitting by the elevator talking to some one, when the appellant called him to the desk, where he was writing a message, and said to him: "The next time you raise your hand on that boy I'll break your neck."  He replied that he did not raise his hand on the boy, whereupon the appellant called him a liar and struck him. The appellant, on the other hand, testified that he was writing a telegram at the desk in the office of the hotel, when the boy came to him crying and said that Morin had been beating him again.    That upon seeing Morin, appellant asked him why he could not let that boy alone, why he wanted to be whipping him all the time; told him that he was not the boy's boss, and had no more right to beat him than he (appellant) had a right to beat him (Morin), to which the latter replied that it was none of his business, and that he would fight appellant, and thereupon struck appellant.   Other witnesses testified in regard to the commencement of the affair, and the most of them corroborated the appellant's testimony upon that point.    But, whatever the truth may be in regard to that fact, it is evident that the parties very hastily engaged in the contest on both sides; that they clinched and struggled among the baggage and tables, and finally separated after Morin said he had enough of it. Morin claimed in his testimony that during the melee his lip was lacerated, his thumb and one of his fingers injured,

and one cheek bruised, and that it was caused by the appellant biting him. It seems that he was very much excited and exasperated at the time, so much so that immediately after their separation he went and got his pistol and fired five shots at the appellant, had a tussle with other parties who were attempting to wrest the pistol from him, and ran off towards the bluffs back of the city; but he finally became more composed, and returned and gave himself up to the police. The wound upon Morin's lip is the only one necessary to be considered, and its importance is not in consequence of its severity, but of its locality.

Under the construction of said section of the Code claimed by the counsel for the State, and which seems to have been given to it by the circuit court in this case, a wound inflicted upon the tongue, lip or nose of a person, by whatever means occasioned, would, if it resulted in a "cutting" of one of those organs, render the party who inflicted it guilty of a felony, which, if made upon some other part of the person, although it were far more severe, would only amount to assault and battery. The counsel for the appellant strongly insisted that the injury to the lip was not caused by biting, but that it evidently resulted from the blow shown by the testimony to have been struck by appellant upon Morin's mouth after he was released from appellant's hold, claiming that the lip was thereby necessarily forced against his own teeth, and that it produced the laceration. But if the injury had been caused in that way and it thereby caused a cutting of the lip, within the meaning of said provision of the statute, the same liability, so far as I can see, would attach. The question therefore to be determined, relating to the point under consideration, is whether the injury to the lip was such a "cutting" of it as would render the appellant answerable to the said provision.

I cannot understand how one man engaged in a scuffle with another, such as took place between the appellant and Morin, could manage to bite the other's lip; but the

jury must have so found, and we are obliged to accept
their finding as conclusive of the fact. We are not, how-
ever, precluded from an inquiry as to the character and
extent of the wound in order to ascertain whether or not
it constituted mayhem under the statute, nor from de-
termining the construction which the statute should re-
ceive. So far as I can discover from the evidence in the
case, the wound involved the lower lip, and the appellant's
counsel stated at the hearing—which was not denied, as I
remember, by the counsel for the State—that it was on the
inside of the lip. But I have not been able to ascertain
from the testimony, to my satisfaction, whether such is the
fact or not, though it might perhaps be so inferred from the
testimony of Max. M. Shillock, a reporter on the *Oregonian*,
who was present when the wound was dressed. He tes-
tified that he received a message to come to the jail; that
Morin had given himself up; that Morin was standing in
the police office; that his hat was off, and his face was cov-
ered with blood, and collar and necktie and shirt pretty
much saturated, and his hands were bloody, and his lip;
there was a clot of blood on his lower lip, and a scar on
his left cheek, and some scars on his fingers; did not ex-
amine the cut in the cheek very closely; watched Dr. Rand
when he dressed the wound on the lip afterwards; it was
about half an inch long; came very nearly to the lower
edge of the upper part of the lip, and the outer skin was
taken off, and exposed the flesh for about a quarter of an
inch, he should think. It was pretty much covered with
blood when he first saw him; it was all clotted blood on
his lip. Dr. Rand, in his testimony as a witness, testified
that the wound was in the center of the lip; thought it was
about three-quarters of an inch long, about half an inch
wide, and about a quarter of an inch thick, "just by es-
timation of it." It was a raw cut or raw laceration, and
bleeding quite profusely; bled on his clothes, necktie, and
shirt; and there were a few scratches on his face and fin-
gers; should think that there was a piece gone out of the
lip of the size he before mentioned.

Morin, in his testimony in regard to the affair, stated that he (appellant) got hold of his lip with his teeth and bit it, and bit a piece off of it, "so when I managed to push him away from me he caught hold of my right finger. He took a part of my lip away; the piece was taken off from here. It has been healed up again with medicine. The lip has drawn up again, but it shows disfiguration."

Henry Griffin, a policeman, testified that he examined the lip when the doctor was dressing it; that it was swollen and all blood, and cut across the bottom of it; that there was a piece out of the lip missing. James Barry, another policeman, testified that when Morin came to the door at the station that night he was bloody on his face, mouth, shirt and hands, very bloody; that "his lip looked like as though it was bit; looked like a piece of raw beefsteak."

It is difficult to obtain from this testimony an intelligent idea of the nature and extent of Morin's wounds, but it is obvious that they were not serious, though the grotesque sight which, in his unwashed condition, he presented, no doubt greatly intensified the enormity of their appearance. There was no testimony in the case showing that the appellant inflicted the injury through a malicious design, or for the purpose of disfiguring Morin's features. The affair evidently arose out of a sudden outburst of passion on the part of the appellant against Morin, incited by the latter's supposed mistreatment of the bell-boy, and of his prompt resentment in return. It was a contest for mastery, in which each of the combatants relied upon his own courage, skill and prowess. It was not conducted in accordance with conventional rules recognized by the popular pugilists of the day, but in a primitive style—a manner which Western people vulgarly term a "ground squabble," wherein nice honor as to the mode in which the parties hurt each other is not observed.

Such occurrences are not respectable, but are disgraceful and demoralizing; yet it is better that they be indulged in occasionally than that men lose their grit and become

dudes and poltroons.   Where parties unfortunately become
involved in such broils, and one of them receives an injury
to some of the organs enumerated in said section of the
Code, I do not think that it renders the party inflicting it
liable to the penalty which that section imposes, although
the injury bo technically of the character therein men-
tioned.   I do not believe that the legislature intended said
provision to include cases arising under such circum-
stances.   It evidently had in view a class of cases in which
the conduct of the parties was wanton, deliberate and
cruel.   The language of the section:   "If any person shall
purposely and maliciously, or in the commission or
attempt to commit a felony," etc., implies something more
than a wounding incidental to a fight.   The statute extends
the law of mayhem, as it existed at common law, to other
subjects, although it does not use the term except in the
title to the chapter of the Code enacted by the legis-
lature.   *State* v. *Vowels*, 4 Or. 324.   In that case the court,
by McArthur, J., says: "It may not be amiss to state that
this section (referring to said § 1735) is based upon the
English statute of 22 and 23 Car. II, ch. 1, commonly
known as the Coventry Act, the circumstances which led
to the passage of which are recounted by Lord Macaulay's
Hist. Eng., vol. 1, 8vo. ed., p. 77."

The "Coventry Act," to which the learned judge
referred, was enacted in consequence of an assault on Sir
John Coventry in the street, and slitting his nose, in
revenge, as was supposed, for some obnoxious words
uttered by him in parliament.   It enacted "that if any
person shall of malice aforethought and by laying in wait,
unlawfully cut or disable the tongue, put out an eye, slit
the nose, cut off the nose or lip, or cut off or disable any
limb or member of any other person with intent to maim
or disfigure him, such person, etc., shall be guilty of
felony," etc.   The circumstances which led to the passage
of the Act and its language show conclusively the reason
and purpose of its adoption and the nature and character
of offense which it was intended to declare a felony and

punish as such; and if the section of the Code was based upon that Act, as suggested in *State* v. *Vowels*, as it undoubtedly was, or upon a similar Act of parliament passed subsequently thereto, then our conclusion that it was intended to apply to a class of cases in which the conduct of the parties was wanton, deliberate and cruel, must be correct. Again, the word "cut" was used in the same construction in said Coventry Act and in English statutes upon the subject passed subsequently as it is used in said section of the Code, and had received a legal construction long prior to the adoption of the section by the legislature of this State. It meant a wound made with a sharp instrument.

Bishop, in his work on Statutory Crimes, § 315, 2d ed., says: "Where the words cut or stab are used, as in the before-mentioned English statutes, they relate only to such wounds as are made by an instrument capable of stabbing or cutting, stabbing being properly a wounding with a pointed instrument, and cutting being a wounding with an instrument having a sharp edge. And if the indictment be for cutting, evidence of a stab will not support the charge; for, as the statute uses the words in the alternate, stab or cut, so as to distinguish them, the distinction must be attended to in the indictment. Yet cutting or stabbing need not have been the purpose for which the instrument was manufactured. For example, a blow from the sharp claw of a hammer, or the sharpened point of an iron crow, may inflict a cut; but not from the blunt end of a hammer or from a square iron bar, producing a contused or lacerated gash, or from the scabbard of a sword, or from the handle of a windlass." It was held in New Jersey that if the nose is bitten off it is cut off—a conclusion not in accord with the English doctrine. Under 1 Jac. 1, c. 8, § 2, employing the words "stab or thrust any person," Hawkins says: "The killing of a man with a hammer or such like instrument, which cannot come properly under the words 'thrust or stab,' is not a killing within the statute." I refer to the latter matter not so much for the

purpose of claiming that the construction by the English courts of the word cut, as used in the English statutes referred to, should be adopted in the construction of the said provision of our Code, but to show that such statutes are only intended to include cases where the act was done deliberately and intentionally. Using a sharp instrument to effect the cutting would imply intention and deliberation, which must be shown in some manner in order to authorize a conviction. This question was fully discussed in *Godfrey* v. *The People*, 63 N. Y. 207. That case arose under the statute of that State upon the subject of may hem, which is perhaps more pronounced in requiring deliberation than our Code, though much of the reasoning of the learned court applies to it with the same force that it does to the New York statute. The evidence there tended to show that the accused and the complainant had been playing cards together and got into a quarrel over the game, which resulted in a fight. The parties closed, and during the struggle the accused bit off a piece of complainant's ear. Miller, J., in delivering the opinion of the court, at page 211 of the case, says: "If the offense was committed within the meaning of the statute, it must have been done 'on purpose' as well as with a 'premeditated design.' There is no real ground for claiming that there was premeditation and a purpose existing at any time during the progress of the conflict, when the passions of both parties were aroused, and there was no time or opportunity for reflection or deliberation. Such an assumption would be contrary to the natural inferences to be drawn from the circumstances and the situation of the parties at the time, and looking at them it cannot be fairly claimed that the prisoner intended to commit the offense of which he was convicted.

"An argument is made by the learned counsel for the prosecution, to the effect that the doctrine of instantaneous malice under the old law of murder is applicable, and that the definition of premeditation as applied to such a case may be invoked. I cannot concur in this view. In cases

of homicide where the offense is committed by means of weapons or by the use of violence sufficient to produce death, such a rule might well be applied, because every circumstance tends to show that the result was intended. But this differs widely from a case of simple assault and battery, where there was a hand-to-hand fight, without any weapon which could be used to maim or disable, and every intendment is against any such purpose. Another answer to this position is that the statute of mayhem in England, as well as in this State, was evidently intended to provide for cases where there was an antecedent and secret purpose to commit the act, and not for casual and sudden affrays where the act was done in the heat of the strife and with no direct evidence of any such intention." In *Tully* v. *The People*, 67 N. Y. 15, a case of mayhem by biting the complainant's thumb so as to permanently disable it, the court held that the evidence was sufficient to authorize the submission of the case to the jury. But there the evidence tended to show that the complainant was riding in a street car; that the accused got into the car and was put off by the conductor for not paying his fare; that he got on again and forced his way into the car, exclaiming as he did so, "Let me in till I eat somebody." After getting in he caught hold of the conductor and bit his thumb. Complainant requested him to be quiet, as there were ladies in the car, and they both sat down. After a few moments the accused sprang up and struck complainant, and as the latter arose, seized his nose with his teeth; complainant put up his hand to protect his face, when the accused caught his thumb in his mouth and began to chew it, and continued so to do until he was forced from the car by the other passengers, hanging on to the thumb until he reached the platform. In the latter case the jury were justified in finding not only that the act was done "purposely and maliciously," but by "premeditated design, as there was direct testimony tending to prove both facts. It devolved upon the prosecution in the case under consideration to prove beyond a reasonable doubt that the

appellant purposely and maliciously, or in the commission
or attempt to commit a felony, cut the lip of the said Morin.
It is not pretended that the wounding of the lip was done
under any such circumstances, nor does the proof show
that it constituted an offense within the meaning of said
section of the Code, if done by biting, as the jury seem to
have found, any more than if it had been done by gouging
with the thumb nail or by a blow of the fist.   The hurt, so
far as I can discover from the testimony, was a laceration
of the tissue which lines the inner side of the lower lip,
and of a nature liable to have been caused by various
means.    According to the testimony of Morin himself, it
has since healed over; and to adjudge it mayhem, in view
of all the surroundings, would be making a felony out of a
comparatively trifling matter.   The punishment which the
law attaches to that character of crimes negatives the
idea that the legislature intended that a scratch or gouge
of that kind, received in a fight in which no artificial
weapons were employed, should constitute so grave an
offense.    The appellant may have been guilty of an
aggravated assault and battery, but to sentence him to the
penitentiary for an act which was done, as said in *Godfrey*
v. *The People, supra*, "where there was a hand-to-hand
fight, without any weapons which could be used to maim
or disable, and every intendment was against any such
purpose," would be inflicting punishment disproportionate
to the offense.   I do not mean to be understood as holding
that the crime of mayham, under the statute, cannot be
committed without the use of a knife or some similar
weapon.    The employment of any direct means in the
accomplishment of either of the results mentioned in said
section of the Code, if made use of for that purpose, would
be sufficient.   The use of a weapon might not render the
wound inflicted any more serious or painful to the party
than if it were inflicted by the use of some of the physical
organs.    But a resort to a weapon under such circum-
stances would afford grounds for an inference that the act
was done purposely and designedly.

The appellant's counsel assigned as another ground of error the failure of the circuit court to instruct the jury that they were authorized to find the appellant guilty of any other offense than that charged in the indictment, the commission of which was included in the one so charged. The counsel for the State insists that the court did not err in that respect, as the appellant's counsel neglected to request such an instruction. The circuit court instructed the jury generally upon the law of the case, so far as it related to their finding the defendant guilty or not guilty of the crime charged. After having instructed them what would constitute mayhem as before mentioned, the court further instructed that it was necessary that the State should make out the proof beyond a reasonable doubt. That it was necessary, also, in order to constitute the crime, that the act should have been done purposely and maliciously with the teeth, and that the lip of Joseph Morin should have been cut, slit or mutilated by the appellant in order to make out the crime. That if they found that his lip had been cut or injured, but were in doubt as to how it was done, or if they should find that it was done by accident or by merely striking him with his fist or with some instrument other than his teeth, then the appellant would not be guilty of the crime with which he was charged in the indictment; that the State must establish satisfactorily that the appellant with his teeth purposely and maliciously cut, slit and mutilated the lip of the prosecuting witness, Joseph Morin. That that was the charge in the indictment; that if they were not satisfied beyond a reasonable doubt that the appellant committed the crime by doing the acts alleged in the indictment, as had been explained to them under the law, then they could not find the appellant guilty, etc. That on the other hand, if they were satisfied beyond a reasonable doubt that the appellant with his teeth purposely and maliciously did the acts charged, with the intent to maim and disfigure the said Morin, then they should find the appellant guilty as charged in the indictment.

This instruction was not. authorized by the evidence in the case, as there was no proof whatever that the appellant slit or mutilated Morin's lip, and not sufficient evidence that he cut it purposely and maliciously. To slit, according to Webster, is to cut lengthwise; to cut into long pieces or strips; to cut or make a long fissure; to cut in general; to rend; to split; and to mutilate is to cut off a limb or essential part of the body; and the latter term, in criminal law, is, according to Bouvier, to deprive a man of the use of any of those limbs which may be useful to him in fight. There is no pretense that the lip in question was cut into long pieces or strips, or rended or split, or cut off; and the instruction, as given, presented to the jury only one of two alternatives, either to find the appellant guilty or not guilty of the crime charged in the indictment. The jury had the right, under section 1383, Criminal Code, to find him guilty of any crime, the commission of which was necessarily included in that with which he was charged, or of an attempt to commit such crime; and section 1359, Criminal Code, provides that "when it appears that the defendant has committed a crime, and there is reasonable ground of doubt in which of the two or more degrees he is guilty, he can be convicted of the lowest of those degrees only."

The jury in this case may have understood that they had the right to find the appellant guilty of a lesser offense than that charged in the indictment, though I think it exceedingly doubtful whether they did so understand. It was therefore highly important to the proper administration of justice that the court inform them in regard to that matter. But whether it was error of the court in failing to give such an instruction when the appellant's counsel neglected to request it is the particular point for determination.

Trial courts in many matters have a duty to perform of their own motion. For instance, it would be error on the part of such court to permit a petit jury to return a verdict in a case of felony in the absence of the accused, and it

would also be error for the court to pass sentence upon him after conviction without putting the formal question as to whether he had anything to say why the sentence of the law should not be pronounced against him; and in *People* v. *Murray*, 40 N. W. Rep. 29, the supreme court of Michigan, in a late decision, held that without any request from counsel, it was the duty of the judge of the circuit court to see that a case was fairly submitted to the jury. The court, by Sherwood, C. J., there said: "While this court cannot reverse a judgment or set aside a verdict upon a review of the facts, when such facts have been properly submitted to a jury, and will not ordinarily depart from such rules of practice as have been adopted as the results of the highest experience, yet under the general superintending power and control over all inferior courts and their proceedings, given under the appellate jurisdiction of this court, I have no doubt, in a criminal case, upon a review of all the proceedings had which have resulted in the conviction of a respondent, if the court can see that a fair trial has not been had, and it is made manifest that injustice has been done, it then becomes the imperative duty of the court, with or without objections and exceptions by the respondent's counsel, to set aside such proceedings and order a new trial, and we think the present presents such a case. * * * The respondent was sworn, and some of his testimony contradicted the people's witnesses, yet no charge was made stating what weight the jury might give to his testimony. Without any requests from counsel, it is the duty of the circuit judge to see to it that the case goes to the jury in a clear and intelligent manner, so that they may have a clear and correct understanding of what it is they are to decide; and he shall state to them the law fully applicable to the facts. Especially is this his duty in a criminal case. * * * Too much reliance is often placed upon counsel by the court in this respect for requests; but this should not be done. The court must do its duty in a criminal case, whether counsel

do so or not.  It is to the court that the accused has a
right to look to see that he has a fair trial."

This view accords entirely with my own idea regarding
the duties of courts of justice charged with the adminis-
tration of criminal law.   The Constitution guarantees to
the accused in criminal prosecutions the right to a fair and
impartial trial, and the duty of enforcing that guarantee
is committed to the judicial branch of government; and no
department of the government has power to deprive the
accused of such right.   Nor can the latter alienate or
waive it.   In *Cancemi* v. *The People*, 18 N. Y., in a trial for
murder, one of the jurors was withdrawn under a stipula-
tion of the prisoner consenting thereto, and also that, by
the record, the case should appear to have been tried by
twelve jurors; it was held by the court of appeals that a
conviction by the remaining eleven was erroneous.   The
court there says:   "Criminal prosecutions involve public
wrongs, a breach and violation of public rights and duties,
which affect 'the whole community considered as a com-
munity in its social and aggregate capacity.'   3 Bl. Com.,
2d ed., 45.   The end they have in view is the prevention
of similar offenses, not atonement or expiation for crime
committed.   Id. 11.   The penalties or punishments for the
enforcement of which they are a means to the end, are not
within the discretion or control of the parties accused; for
no one has a right, by his own voluntary act, to surrender
his liberty or part with his life."   Pages 136, 137.

The Constitution of this State provides that in all crimi-
nal cases whatever, the jury shall have the right to deter-
mine the law and the facts, under the direction of the court
as to the law, and the right of a new trial, as in civil cases,
and it requires the judge of every court, before entering
upon the discharge of the duties of his office, that he will
support that fundamental law upon which all the institu-
tions of the government are built.   How can a trial court
neglect to direct a jury as to the law applicable in such
cases consistently with the discharge of its duty?   The jury
must take as their guide in their deliberations the law as

laid down by the court, which is an important means for securing to the accused a fair trial and just decision.    In *Lang et al.* v. *State*, 1 S. W. Rep. 319, a Tennessee case, the court says: "In all criminal prosecutions the accused is entitled to a full, fair and plain statement by the court to the jury of the law applicable to his case;" and in *State* v. *Banks*, 73 Mo. 592, the majority of the court held that it was the duty of the trial court in criminal cases to give correct instructions covering the whole law arising on the facts, whether such instructions were asked or not, and such has been the uniform rule of decision of the courts of that State for the past half century.    In the latter case Mr. Justice Norton dissented, stating as the grounds thereof the following:    "Whether error was or not committed by the trial court in not instructing the jury as to some lower grade of homicide than murder in the first degree (which was the point the trial court had failed to instruct upon) was a matter of exception, and as the attention of the trial court was not pointedly and specifically called to the alleged error, either in the motion for a new trial or in arrest of judgment, it cannot be raised in this court for the first time; and we have no power to reverse a judgment in a matter of alleged error not excepted to in the trial court and to which the attention of said court was not called."

According to this view of the question the learned judge would seem to attach more importance to technical rules of practice than to the obligations imposed by the fundamental law.    The reason for his dissent was in effect that the accused should be precluded from alleging error on account of the neglect of the trial court to give proper instructions to the jury because he failed to point out its neglect in that particular.    If the reason were a valid one, it must be upon the ground that the accused, by his failure to point out such neglect of the court, waived the error; at least I cannot discover any other ground upon which it can be based.    The waiver of a legal right in the trial of a civil action may properly be maintained.    The doctrine of

waiver depends upon the maxim *consensus tollit errorum*, and it may consistently be resorted to and enforced in civil cases, as the parties in such cases are free to act, and their consent only affects individual rights.  But in criminal prosecutions the accused is proceeded against on behalf of the State, to be dealt by in accordance with the law, which is the only warrant for the proceeding.  His attendance in court in that case is enforced; he is there by compulsion to do and receive whatever the court may deem proper, under the rules of law, to inflict upon him.  He is entitled to the benefit of certain reserved rights, but is not authorized to consent to anything beyond formal matters, or which subserve his interest.  Nor is the court justified in acting upon the consent of the accused in any matter affecting his right to a fair and impartial trial.  The law marks out the line which the court is required to pursue, and if it deviate therefrom in any particular which might operate prejudicially to the accused, it is no excuse to claim that he consented thereto or waived his right to challenge the irregularity.

I do not see how it can be maintained that the appellant in this case, or the accused in *State* v. *Banks, supra,* was required to except to the omission of the trial court to instruct the jury fully upon the law applicable to the case, in order to enable him to take advantage of such omission upon appeal, if the accused in *Cancemi* v. *The People, supra,* were entitled to claim error on account of being tried by a jury composed of only eleven jurymen, when he expressly consented to it.  If a party charged with a public offense may consent to a waiver of one of the immunities which the Constitution of the government throws around him to insure a fair and impartial trial of the case, I do not see why he could not dispense with them all.  Of course, there are a number of rights the accused is entitled to which must be demanded by him before the court can know that he desires the benefit of them.  The right to have compulsory process for obtaining witnesses in his favor belongs to that class.  The accused must show in such

case that the demand was made to the court before he can claim that the right has been denied him. But where the court fails to discharge a specific duty of its own, which it is required to perform of its own motion and which may operate to the prejudice of the accused, I do not think it can be claimed that the latter waived its performance by neglecting to interpose an objection or to call the attention of the court ''pointedly and specifically '' to the fact. The accused could not give his consent in advance that the court might neglect the duty, and I do not see, therefore, any reason for claiming that he could thereafter ratify it. The weight of authority, estimated by the number of decisions, may be against the view here indicated, but I think it is correct in principle. When the offense charged includes a lesser offense, and there is any question as to the accused being guilty of the greater, it is highly essential that the trial court instruct the jury in regard to their right to find him guilty of the lesser one, in order that he may have the benefit of any reasonable doubt in the premises.

The importance of such an instruction was exemplified in this case. The jury evidently believed that the appellant was guilty of an act for which he should be punished; but, as I would infer from their recommending him to the mercy of the court, they were reluctant to find him guilty of the crime as charged in the indictment. He could very properly have been convicted under the evidence of assault and battery which, according to my view, was the highest grade of offense he committed, and I think it highly probable that if the trial court had given the jury the instructions suggested, they would have found him guilty of that offense, instead of finding him guilty of one of the degree of felony. There is no good purpose to be served in attempting to rush men into the penitentiary on account of matters growing out of ordinary broils, which are liable to occur between good citizens. Such affairs are to be deplored, but community will never become free from them so long as men possess temper and combativeness, and are in

such juxtaposition that their interests and passions collide. Several other questions are presented in the bill of exceptions, but it is not necessary to consider them.

The judgment appealed from should be reversed and the case remanded to the circuit court for a new trial.

LORD, J., dissenting.—It will be my effort to submit my views briefly, as they can serve no other purpose than to furnish the reasons for my dissent. The main point upon which the case is decided was suggested in the brief, but not argued, and is to the effect that the evidence does not warrant the verdict, or is insufficient to constitute proof of mayhem. It is based on the theory that the evidence only shows a mutual altercation or quarrel, suddenly developed into a fight, during the heat and excitement of which the defendant bit out a piece of the under lip of one Morin. The opinion admits that the offense may be committed as charged, but affirms, as a matter of law, that the evidence does not show that it was purposely or maliciously done, because it was done or committed during the progress of a fight, suddenly precipitated, and in the heat and excitement of passion, when the defendant was incapable of forming a purpose or acting from motives of malice, and therefore there is wanting an essential ingredient to constitute the offense charged.

For the purpose of this case only, I am willing to accept the view that an injury of the character charged, committed on a person during the heat of a fight, not deliberately or purposely sought and forced on the other without his consent and against his protest, will not constitute sufficient proof of mayhem, and is conclusive of this case. As all questions of fact belong exclusively the jury, the court cannot invade its province except to examine it for the purpose of ascertaining whether there is any evidence or such a defect in it as the law declares will not warrant a verdict of guilty. But, if there is any evidence tending to show there was matter material for the jury to consider, although different men might disagree as to the conclu-

sions to be drawn from it, evidence that tended to show that the defendant did not act from sudden heat of passion, whether weak or strong, but that he deliberately and purposely forced a fight on the other against his will and protest, and in the course of which he perpetrated the crime of mayhem, although there may be other evidence tending to contradict it, the material facts involved in the issue are controverted and the inferences to be drawn from them are uncertain and disputed, and are exclusively for the jury. A motion of this character is said to be equivalent to a demurrer to evidence, that it serves the same purpose and is to be tested by the same rules, and that as such it not only admits the facts, but also every conclusion which a jury might fairly or reasonably infer from them. In such case it must be borne in mind that the facts submitted in evidence are to be taken as true—not disputed, but admitted—and concede to the State as plaintiff every proper inference which may be fairly drawn from them, and that the defendant, granting all this, nevertheless claims that the evidence is insufficient to sustain the crime with which he is charged. In considering a like motion, that eminent jurist, Mr. Justice Dillon, said: "It must be assumed that all the evidence in the case is true, and that the witnesses are credible, for if there are questions relating to the credibility of witnesses, or if what the evidence proves depends upon the credibility of witnesses or upon the proper deduction to be drawn from the evidence, these are questions not for the court but for the jury under the direction of the court." And referring to the right of the jury to pass upon the evidence, whether weak or strong, citing from another United States case, he says: "It was not proper for the court to wrest this part of the case, more than any other, from the exercise of their judgment. The instructions overlooked the line which separates two separate spheres of duty. Though correlative they are distinct, and it is important to the right administration of justice they should be kept so. It is as much within the province of the jury to decide questions

of fact as of the court to decide questions of law. The
jury should take the law as laid down by the court and
give it full effect. But its application to the facts, and
the facts themselves, it is for them to determine. These
are the checks and balances which give to the trial by jury
its value. Experience has proved their importance.
They are indispensable to the harmony and proper efficacy
of the system. Such is the law." *U. S.* v. *Babcock*, 3 Dil-
lon, 578, and cases cited.

In the light of the law as thus expounded, and which no
one will dispute, it becomes our duty to examine the evi-
dence, and if there is any which, if taken as true, tends
to show that the fight was not the sudden outgrowth of a
mere altercation or dispute, but was purposely and delib-
erately inaugurated and prosecuted by the defendant
against the man Morin, and that the offense was com-
mitted during its progress under such circumstances
created by the defendant, and that these facts present
material matter from which to deduce the inference of
purpose or motive which prompted the defendant to com-
mit the act charged, then, such facts as evidence being
material to the issue, although there is other evidence in
contradiction of it, they are exclusively for the considera-
tion of the jury. For no proposition is better settled when
the evidence is conflicting or the facts controverted, and
the inferences to be drawn from them are uncertain and
disputed, although different men equally sensible and
equally impartial would make different inferences, than
that the law commits the case to the decision of the jury
under instructions from the court. In advance I may say
I shall take the position that there is evidence tending to
show that Morin was not engaged in any dispute with the
defendant out of which, in the heat of the moment, a sud-
den fight was precipitated, but that the defendant sought
him and charged him with doing that which he denied,
and deliberately struck and forced him to fight, and that
when he had him down and at his mercy the defendant
bit him on the lip and cheek and finger, while he was

calling out to the defendant to "let me up and not bite me," and that the defendant paid no heed to his entreaties, and that when Mr. Freeman invoked some one to interfere to stop "the disgraceful fight," the brother of the defendant in effect defied any one to interfere, and that when at last he was released from the grasp of his assailant and Morin got up covered with blood, he dealt him a severe blow in the face. I admit that there is other evidence introduced by the defendant that contradicts this, and tends to establish the state of facts suggested in the opinion, but this only goes to show that the facts in controversy are disputed and that the evidence is conflicting, in which case its proper solution necessarily depends upon the credibility to be attached to the witnesses, all of which only shows more emphatically and conclusively that the case is for the decision of the jury and not of the court.

Morin in substance testified that he was engaged at the Holton House as porter, and on the seventeenth of March,. while he was attending to his duties as porter, he had some words with the bell-boy, who insisted on running the elevator up and down in such a manner as to interfere with his work. He says: "I went up in the elevator and left the elevator there until I fetched the baggage in. I had two more valises to fetch there, and when I was in the room some one rang the bell for the elevator and the bell-boy Frank ran the elevator down, and when he came down and stopped there I warned him not to do so, etc. Then I came down stairs with the baggage. I had six trunks to run out on the sidewalk for the expressman, so I run them out and helped him to put them in the express wagon." It may not be amiss to say at this point, that I have been thus particular in stating this matter in order to show the frame of mind, the relation of the parties, and the condition of affairs which existed prior to the fight.

Continuing, he says: "When I got done with the work I came in the office, and was sitting by the elevator talking to some one, and Al. Cody called me. He says 'Frenchy,'— he called me by the name of 'Frenchy;' I says 'Well,' and

I walked to the desk—he was writing a message or a letter—and he said to me, 'The next time you raise your hand on that boy I will break your neck.' I says, 'I didn't raise my hand on that boy;" he replied, 'You are a damned liar,' and struck me in the eye at the same time—in the left eye—with his right hand. He made forward round front of the desk in the office and clinched me, and I clinched him, and the two of us wrestled around on the floor until some one was going to interfere, and I heard Arthur Perkins say, 'Let them fight it out.' When I fell back on the table he was on the top of me, and he put his teeth into my cheek, there;" (exhibiting the mark. That is a part of the evidence this court is unable to see.) "Then I pushed him back with my hand so that he could not disfigure me, and he got hold of my thumb and bit that also, and there is the mark and scar on that yet. I had to get it lanced three times from blood poisoning, and Doc. Wheeler and Doc. Rand could tell you the same thing. When I managed to get my thumb away from him, then he took my lip and took a piece out of my lip here, and then got hold of my finger here, which has the scar yet." Juror. "Let me see that finger." (Witness exhibits to the jury his finger, lip and cheek.) "He got hold of my lip with his teeth and bit it, and bit a piece off of it, so when I managed to push him away from me, he caught hold of my right finger," etc. Referring to his lip, he said: "The piece was taken off from here; it has healed up; the lip is drawn up again, but it shows disfiguration."

It must be borne in mind that some of these statements were visible to the jury, if true, and that they were in a position to estimate their value and draw the proper inferences from them. Continuing, he said: "While he had my finger in his mouth and chewing it, I said to the people standing around, 'Don't you see that man is biting me and trying to disfigure me for life,' and no one seemed to pay any attention to it." And right here, let it be observed, if what the witness stated is true, and the jury are the judge of that, are these not facts from which the

XVIII. OR.—34.

inference of the defendant's purpose may be drawn? He had bitten him on the cheek and thumb, a piece out of the lip, and lastly on the finger, and the witness evidently thought by his expressions or declarations made while suffering from the pain inflicted by this bite and during the fight, that his purpose was to disfigure him. It certainly ought not to require the argument, "put yourself in his place," to know that these are facts admissible for the purpose of showing the intent with which the offense charged was committed. Recurring to the witness, he says: "I told him, 'Cody, don't bite me,' and that I said three or four times. When I got up and saw I was disfigured for life I got a pistol and opened fire upon him," etc.

Mr. Freeman, who was being shaved in the barber shop in the adjoining room when the fight occurred, and is an officer in the O. R. & N. Co., testifies that "I heard a scuffle and I thought I would go out and see if I could not stop the trouble, but I found that I could not do anything. I called upon some of them to stop it, and they said 'let them fight it out.' Arthur Perkins said 'let them fight it out.' I think I asked them why they did not not stop this disgraceful fight. Cody's brother was there on the occasion and seemed to be defending his brother, keeping the crowd back, and after Perkins said 'let them fight it out,' this man (Cody's brother) turned and defied anybody to interfere. Morin was underneath Cody and he said he wanted to be let up, let alone; he said he didn't want to fight, but he wanted to be let alone, take him off, or something like that; I think that was the words. His condition was bloody; there was blood all over his face. The Frenchman (Morin) was cut badly." Replying as to the character of the fight, he said: "I could not see any blows struck and did not see any. They seemed to be clinched and close together. Their heads seemed to be close together. The back of Cody's head was next to me, and I could not see what he was doing. Cody was on top of him. Morin was bloody when they separated when he

got up, and Cody struck him a blow after they got up and separated," etc.

Rudolph Marsch, a barber in the Holton House, who was engaged in shaving Mr. Freeman at the time the row occurred, among other things, said:　"I saw Cody on top of Morin, and I heard Morin say, 'let go, don't bite me.' That he heard Morin cry out 'let me up and don't bite me,' three times," etc.　Another witness was Doctor Rand, who described the wound on the lip, the size of it, etc.; that it was caused by the teeth; but as these facts are not questioned, it is unnecessary to consider them further. Several other witnesses were examined whose testimony is corroborative of the facts that he was bit on the cheek and finger and thumb, and that a piece was bit out of his lip, and one of whom seemed to think that Morin was "chewed" quite severely, but we have not the space nor time for further detail, nor is it necessary, as a sufficient quantity of the testimony is already presented to serve the purpose of my argument and, I think, to show that the judgment rendered cannot be sustained on the theory propounded.

As the evidence we have recited must be taken as true and stands confessed, the plaintiff is entitled to every fair and reasonable inference of which it is susceptible and, if it is material, whether weak or strong, or about which men of equal intelligence and fairness might differ, it is for the jury, and cannot be reviewed by the court without a usurpation of their duties, however honestly or unconsciously done.　Analyzing this evidence, it shows that at the time Morin was called to him by the defendant, that he was seated by the elevator, chatting, he thinks, with some one, and utterly unconscious of any hostilities or controversy between himself and the defendant and, in fact, so far as he was concerned, there was none by the record. Morin responded promptly to the defendant's summons, saying, "Well," and the first words of the defendant, judged by what he said, that he would "break Morin's neck," were indicative of a spirit and purpose which con

templated a more heinous offense than he subsequently committed; but waiving this view they indicated, at least, a spirit, backed by a purpose already formed, of hostility and injury to Morin; or if there is any doubt at this point, it is conclusively shown by the defendant's conduct which immediately succeeded; for when Morin denied his accusation, he instantly called him "a damned liar," and followed it with a blow in his face and clinched him. Thus far Morin is a passive party and has done nothing to engender any heat of temper or cause hostilities. There is no controversy or dispute. Nor is there any mutual altercation between them which, from bandying epithets, the temper of the parties growing more and more inflamed, is suddenly and unexpectedly developed into a fight, and during the progress of which the offense charged was committed. In that kind of case the facts might preclude the idea of malice or purpose, but when all the acts and conduct of the other party indicate a determined spirit of hostility and a purpose to injure, it is a legitimate inference that he intended the consequences inflicted by his acts. The jury have a right to make this inference until by other proof he overcomes it in some way and establishes the fact to be otherwise. The purpose to injure or malice is formed before the fight, and when he inaugurates it, all that follows is presumed to be incident to that purpose, and the heat of battle only adds vim to its execution; but in the other case the purpose is wanting, and when from word to word the dispute grows into a quarrel and a fight is suddenly precipitated, the heat of battle and its excitement excludes the idea of a deliberately formed purpose or malice. As evidence of facts from which the inference of purpose or malice may be drawn, consider the character of the "disgraceful fight," as Mr. Freeman called it; *it was one of biting* more than blows. Mr. Free man saw no blows except the one after separation, but he saw their heads together and the defendant was on top, and the result showed that the defendant was biting. More, the progress of the fight shows that as fast as

Morin got loose from his teeth in one place he seized him in another, and so kept on until he had gone from cheek to thumb, lip and finger, and despite his entreaties to be "let up" and "not to bite me," reiterated three or four times, and his vain appeals to the crowd to witness that the defendant was biting him, etc.; the defendant, who seems to have been surrounded by his friends, and one of whom defied interference, paid no heed to his cries; the "disgraceful fight" could not be stopped, and the defendant continued to bite until Morin, when released, looked as if he had encountered a wild beast, so bitten and bloody was his appearance.     Take all these facts together and consider how the fight was initiated, that it was not a fight struck out suddenly from mutual altercation, but that it was deliberately begun by the defendant and forced upon Morin despite his protests, and during its progress the constancy with which the defendant bit him despite his appeals to let him up and not bite him, and can it be said that these circumstances do not tend to support the charge and are not material evidence for the consideration of the jury?     Do they not tend to show that the offense was committed, not during the excitement of an unpremeditated, but a premeditated fight, forced on an unoffending party?  Do they not show that after the fight was begun that the defendant conducted it with brutality and a determined spirit to injure?     Are not these circumstances susceptible of the inference that the act charged was done purposely or maliciously, and whether weak or strong, if they are, the inference is for the jury and not for the court.     A man cannot force a fight on another and during the progress of it commit the offense charged, and then plead the heat and passion of its brutal prosecution to escape the consequences of his crime.     To allow such an argument or defense, any ruffian might force a man of peace, and law-abiding, into a fight for the purpose of inflicting such an injury, and when he had consummated his purpose and disfigured his victim for life, escape the just punishment of his crime.     The law will not allow a

man to create the conditions which give birth to his crimo and escape the consequences of it.

Of course I am considering these facts only for the purpose of showing that there are facts material in the case, and that taken as true, as required to be, they will not warrant the conclusion reached by my associates; nor does it make any difference that there is other evidence which contradicts it, for that only renders the argument more conclusive that the case is for the decision of a jury and not for the court. It may be that the result I reach might inflict pain and sorrow, and if so, while I should regret it, it could afford me no excuse for dereliction of duty. I am bound to be governed by the record, and when that, as certified to us, makes a case for the jury, the matter is for them to decide and beyond our interference. But if I could consent to pass in silence this point, the principle declared or overturned in the next is so at variance with my views of the law that I should violate my sense of duty not to record my dissent. I cannot concur in the proposition that we may look at any other matter in a bill of exceptions save such as has been excepted to and assigned as error. On the contrary, I hold it is only such particular matter as the trial court has been required to decide in the progress of the trial, which has been excepted to and certified to us as alleged error, that is the subject of appellate review, or of which we can take cognizance. Any other view seems to me to be in conflict with the purpose of a bill of exceptions and the matter it should contain. It involves no question of consent or dissent of the defendant, but simply whether the bill of exceptions certified to us that the matter complained of was decided by the court and excepted to as error and put therein for the purpose of having it reviewed and decided in the appellate court. Where the trial court has charged no proposition of law nor made any decision in the progress of the trial not excepted to and reserved for the appellate court, or where the trial court has omitted to charge some matters that counsel claimed it ought to have charged, but

to which counsel did not call the attention of the court and require it to so charge, so that the point claimed and the decision upon it may be excepted to and put in the record or bill of exceptions and certified to us as alleged error, there is nothing in the record for our cognizance and which we can examine and decide. The fact that the whole of the evidence may be in the record for some particular assignment of error gives us no right to pry into it to discover some other error not alleged, or that all of the instructions are included in it to serve some special purpose assigned as error, as that such instructions do not cover certain instructions asked and refused and excepted to as error, gives us cognizance or the right to examine and consider any other error than that reserved and assigned, and to which we are bound to confine our decision. No other is certified to us by the trial court, and, in legal contemplation, no other can be before us for our cognizance. A bill of exceptions is defined to be a statement in writing on an objection made by a party to the decision of the court on a point of law, clearly stating the objection, with the facts and circumstances upon which it is founded, and, in order to attest its accuracy, signed and sealed by the judge or court who made the decision, *the object being to put the decision objected to upon record for the information of the court having cognizance of the cause in error*. 2 Am. & Eng. Ency. L. vol. 2, p. 218. It was said by this court in *State* v. *Drake*, 11 Or. 398: "Originally at common law no matter could be assigned as error except such as appeared in the record; and as the parties were bound by it as absolute verity, they were not allowed to impugn or contradict it by averment. The rulings of the court in the progress of the trial, and often of vital importance, did not appear in the record; nor were there any means of introducing them into it, and the consequence was that the party believing himself aggrieved was without remedy. To obviate and remedy this defect the statute, Westm. 2, 13 ed. 1, ch. 31, was passed, which established in practice what is now known as a bill of exceptions. Its object was to bring in

the record the particular matter excepted to and supposed to be error, and which the record would not otherwise disclose, to lay the foundation for proceedings in error. It is required, therefore, to be in writing, clearly stating the point wherein the court is supposed to have erred, with the necessary facts and circumstances, to attest the accuracy and authority of which it must be signed and sealed by the judge who made the ruling or decision."

It must be clear, then, that a bill of exceptions only lies to such errors of law as have been made during the progress of the trial and to which counsel have reserved exceptions, and that it can properly only contain such matter as on which the decision to be reviewed is founded, and only those to which such decision applies, whether these be made in deciding as to the admissibility of evidence, instructions, or in accepting or rejecting witnesses, etc. If I am right in this view, the circuit court is reversed for an error not alleged and certified to us, and not, therefore, in the bill of exceptions for our information and cognizance. Nor is any constitutional right of the defendant waived or violated. The case of *Cancemi* v. *People*, 18 N. Y. 128, has no relevancy to the point here involved, either directly or by analogy; that involved the right of an accused to be tried by a greater or less number than twelve men, which the fathers of the constitution in their wisdom saw fit to provide. That the weight of judicial authority in criminal cases is that such right cannot be waived, no one disputes. And yet a contrary view is supported by authority, with reasons not easy to answer: "A conviction," said Seevers, J., "can only be legally obtained in a criminal action upon competent evidence, yet if the defendant fails at the proper time to object to such as is incompetent, he cannot afterwards do so. He has a constitutional right to a speedy trial, and yet he may waive this provision by obtaining a continuance. A plea of guilty ordinarily dispenses with a jury trial, and it is thereby waived. The defendant may have consented to be tried by eleven jurors because his witnesses were then

present and he might not be able to get them again, or
that it was best that he should be tried by the jury as thus
constituted.    Why should he not be permitted to do so?
Why hamper him in this respect?    Why restrain his
liberty or right to do as he believed for his own interests?"
*State* v. *Kauffman*, 51 Iowa, 579.    It is seen, then, that the
argument is controverted, but what pertinency or analogy
can it have to the point here involved?    The omission of
a judge to charge that the defendant may be convicted
of a lesser crime than the offense charged is not a subject
of constitutional provision and involves no question of
constitutional right of the accused to be waived or other-
wise.    The constitutional provision giving to a party a
right to trial by jury means a common law jury of twelve
men, and no other number of men, greater or less, will
meet the requirements of this provision.    The reason is
that consent cannot give the court jurisdiction or authorize
a substantial change in its fundamental mode of proceed-
ing that can neither be enlarged nor restricted.    *People* v.
*Guidici*, 100 N. Y. 508.

But we look in vain for any provision out of which may
be evolved the idea that an omission in the charge of a
judge, in a criminal action, involves any constitutional
right or privilege of the accused, which is fatal to his
trial, and renders it illegal and void.    It is not a matter
which affects jurisdiction or the mode of proceeding.
Such an omission stands upon the same footing as any
other matter which may be omitted in the charge, which,
to be made available, must be reserved by exception and
assigned as error to be the subject of review in the appel-
late court.    In such case the inquiry is not one of con-
stitutional law, and no arguments drawn from that source
have any relevancy or applicability.

Again, it is admitted in the opinion that the weight of
authority is against it, and to my mind this implies that
the weight of reason is against it, unless the reason
assigned in the opinion outweighs them.    "In criminal
actions," said Mr. Chief Justice Shaw, "by the form in

which the issue is made up, the jury pass upon the whole
matter of law and fact.    It is the duty of the judge to give
such instructions to the jury in matters of law as in his
judgment may be calculated to aid and assist them in
forming their verdict.    But he is not bound to give
instructions upon any particular questions unless his atten-
tion is called to them and they are particularly requested,
in which case, if pertinent, instructions will be given; and
if the judge thinks proper, he will reserve the question of
their correctness."    *Commonwealth* v. *Keenland*, 20 Pick.
222.    Mr. Chief Justice Shepely says:    "The court must
first be requested to charge upon the point made, and if
the request is refused, exceptions may be taken."    *State* v.
*Straw*, 33 Me. 554.    The reason of the rule, says Mr.
Thompson on Trials, rests upon the soundest foundation.
The facts of the case come to the mind of the judge as mat-
ters of first impression, and it will often be extremely
difficult for him, in the short time allowed for a trial before
a jury, in the midst of such a trial, to prepare a series of
instructions applicable to all the hypotheses presented by
the evidence.    On the other hand, counsel are presumed to
have studied their case beforehand,—to come to the court
with a full knowledge of the law applicable to those facts.
It is therefore their duty to give attention to the charge of
the judge, and if, in their opinion, he omits to give direc-
tion as to the law applicable to any essential feature of
the evidence, to call his attention to the omission, and to
request appropriate supplementary instructions; and where
they fail to call his attention to something which he may
fairly be supposed to have omitted from inadvertence, they
ought not to be allowed to complain of the omission in an
appellate court.    A rule which would allow them to do so
would be extremely inconvenient.    It would multiply new
trials and reversals, and often on grounds which have no
connection whatever with the merits."    Thomp. on Trials,
§ 2341.    Does any one suppose, if the learned counsel for
the defendant had observed the requirements of this rule,
and called the attention of the court to the matter now

claimed to be prejudicial, that they would have had any ground for complaint? And can they take advantage of an omission which duty to their client and the trial court required them to point out, and constitute it as an assignment of error, with which to reverse the judgment? As that distinguished lawyer, General Williams, when judge of this tribunal, well said: ''Prisoners in our courts are provided with counsel, confronted with the witnesses against them, allowed to except to all the court says and does upon the trial, and it is no hardship to say that if they have any objections to the acts of the tribunal before whom they are tried, they shall make their objections known or forever after hold their peace." *Territory* v. *Kelly,* 1 Or. 58.

In all these matters the defendant is represented by his counsel, who are supposed to be skilled and learned in the law, and vigilant, attentive and faithful to his interests according to the injunction of their oath, and upon whom devolves the duty to see that all the requirements of the law are observed, so that he may have a fair trial, and to prevent and guard against any failure therein either of omission or commission in the trial court, to point out and reserve the matter prejudicial to his client, and save it by exceptions for the consideration and judgment of the appellate tribunal. Such a rule not only prevents unnecessary delay and expense, but new trials and reversals needlessly multiplied and often without regard to the merits; but what is more important, it makes it the duty of counsel, although representing divers interests as to clients, to mutually aid the court in rightly administering the law. Any other rule seems to me to be subversive of the soundest principles of justice regulating trials and to invite to practices or conduct which are calculated to lower the standard of professional ethics and to obstruct the proper administration of the law. In England such a rule has never found countenance, and it is impossible under their rules of practice. Nor ought we to tolerate it. The law is not a scheme of chicanery contrived by knaves to outwit justice, but a system of enlightened principles

devised by the "collected reason of ages" to establish justice, and committed to the courts to be administered for the protection of society and the punishment of criminals. A man who bites when he fights like a wild beast, lacerating and disfiguring his victim, is not an object worthy of admiration or sympathy, or even likely to be respected or tolerated by those who delight in brutal sports, and regard pugilism as a manly art; nor is he deserving of any other consideration at the hands of the court than the bare law affords; nor for whom ought it to overturn a rule of law, founded in reason and supported by the unquestioned weight of authority.