[Crim. No. 3107. Second Appellate District, Division Two.—July 1, 1938.]

THE PEOPLE, Respondent, v. EDGAR S. BULLINGTON, Appellant.

George Perkins and Henry W. Bullington for Appellant.

U. S. Webb, Attorney-General, Alberta Belford, Deputy Attorney-General, Buron Fitts, District Attorney, Jere J. Sullivan and Arthur L. Veitch, Deputies Attorney-General for Respondent.

WOOD, J.—An information was filed against defendant charging him with the crime of violation of section 290 of the Penal Code in that he did "feloniously mutilate the dead body of Michael Conway, a human being". At a jury trial he was found guilty and sentenced to the state penitentiary.

For about ten years defendant was employed as an embalmer at the morgue maintained by the county of Los Angeles. The work at the morgue is divided into three shifts, the first shift beginning at 9 A. M. and ending at 5 P. M., the second shift beginning at 5 P. M. and ending at 1 A. M. and the third shift beginning at 1 A. M. and ending at 9 A. M. On the day shift beginning at 9 A. M. the chief embalmer and a number of attendants are employed. On each of the other two shifts an embalmer and two mortuary attendants are employed. On January 10 and 11, 1938, defendant was the embalmer working on the shift from 5 P. M. to 1 A. M.

The body of the deceased was brought into the morgue at 6:45 A. M. January 10th, and at 8 A. M. the embalmer then on duty, one Monroe, started to embalm it. At 9 A. M. Monroe went off duty and the chief embalmer, McCue, con-

tinued with the work of embalming until it was finished at about 10 A. M. The body was embalmed with a hard fluid. A number of witnesses testified that they saw two gold crowns on the teeth of the deceased. During the preparation for the embalming the lips of the deceased were sewed together and when the embalming was finished the body was placed on a truck opposite one of the crypts. Mr. McCue testified that ten minutes before he went off duty at 5 P. M. he inspected the body and observed that the lips were still sewed together with string and that there was vaseline on the lips to stick them together. He lifted the corner of the lips and saw that the gold crowns were still in place. During the next shift the two mortuary attendants occasionally made trips away from the morgue to bring in other bodies and during these periods defendant was alone at the morgue. Mr. Monroe returned to work at 1 A. M. on January 11th and relieved defendant. He testified that he looked at the body of the deceased and observed that the gold crowns were missing. He then took the two attendants who worked with him on this shift to observe the condition of the mouth and the absence of the crowns. When Mr. McCue returned to work at 8 A. M. on January 11th, he and Mr. Monroe looked at the body and observed that the lips were still sewed together but that the vaseline was not upon the lips. The mortuary attendants on all of the shifts were called as witnesses and each denied that he had removed the crowns.

At 10:30 A. M. on the morning of January 11th, detectives Ledbetter and Hurst met defendant at 1045 Overton Street and informed defendant he must accompany them to the coroner's office. Defendant drove his own car and the officers followed in a different car. Defendant parked his car at the corner of Temple and Grand Avenues, about three blocks from the morgue. At that time the officers searched defendant's automobile and under the driver's wheel found a small manila envelope torn in half. This envelope was delivered to Mr. Pinker, chemist on the Los Angeles police force. In the vest pocket of defendant the officers found another and similar manila envelope containing a small piece of gold which defendant stated had been used as a filling in one of his own teeth. Defendant's statement was later verified by the dentist who had done the work on defendant's tooth. Defendant told the officers that his cigaret pack-

age had become wet and that he had used the torn envelope found in the car in which to carry four or five cigarets. Evidence of gold in the torn envelope could not be detected by the naked eye. Mr. Pinker testified that from his microscopic examination he determined that "the interior of the envelope was contaminated with miscroscopic portions of a metal having a gold appearance in color. From spectrograph examination of those I determined that it was an alloy of gold and silver containing the element boron". He further testified that in dental work an alloy of silver and gold is customarily employed; "that boron can enter the metal in the form of a flux, or from the molding that is used in molding the filling or the crown". The witness further testified that jewelers use an alloy composed of gold and silver and that the gold specks found in the envelope could have come from jewelry; that jewelers use boron for a flux. The envelopes found in defendant's pocket and on the floor of his car were of the kind customarily used in the county morgue for the purpose of preserving small pieces of jewelry and cash found on the body of deceased persons.

Two funeral directors, who had had many years of experience in embalming dead bodies, testified that if a body had been embalmed with a hard embalming fluid it would be very difficult to open the jaws seven hours after the embalming; that the jaws would be set in about two hours. That it is customary to sew the mouth before embalming. That after embalming the flesh becomes rigid and hard; that the flesh can be stretched but that it is almost impossible to get it back to its original position. That after seven hours from the time of embalming any movement of the jaw or lips could not be repaired but would be discernible; that the teeth could not be taken out after embalming without breaking the strings.

■■ Defendant now contends that the acts he is accused of having committed do not constitute a violation of section 290 of the Penal Code; and that the evidence is insufficient to justify the finding of the jury that he removed the gold crowns. Both of these contentions must be sustained.

The trial court refused to instruct the jury at the request of the defendant that the removal of the gold caps without the removal of the natural teeth of the deceased did not constitute a mutilation of the dead body but the court did

instruct the jury as follows: "A removal of a crown cemented upon a tooth of the body of a dead human being constitutes a mutilation of such body. If such act be done willfully and unlawfully, it constitutes a violation of Section 290 of the Penal Code of the State of California." It will be noted that the court took from the jury the consideration of the question as to what constituted a mutilation but positively held as a matter of law that the removal of two crowns which had been cemented to the natural teeth of the body constituted a mutilation within the meaning of the code provision. Section 290 of the Penal Code is as follows: "Every person who mutilates, disinters, or removes from the place of sepulture the dead body of a human being without authority of law, is guilty of felony. But the provisions of this section do not apply to any person who removes the dead body of a relative or friend for reinterment." The legal dictionaries are in accord as to the meaning of the word "mutilate". In Bouvier's Law Dictionary we find: "The depriving a man of the use of any of those limbs which may be useful to him in fight, the loss of which amount to *mayhem*." In Words and Phrases, first series, volume 5, page 4645, we find: "The term 'mutilate' as applied to a person, means to 'cut off a limb or an essential part of the body', and in criminal law means 'to deprive a man of the use of those limbs which may be useful to him in fight'." In *State* v. *Cody*, 18 Or. 506 [23 Pac. 891, 896, 24 Pac. 895], it is stated: "And to 'mutilate' is to cut off a limb or essential part of the body; and the latter term, in criminal law, is, according to Bouvier, to deprive a man of the use of any of those limbs which may be useful to him in fight." Turning to the general dictionaries we find in the Standard Dictionary this definition: "To deprive of a limb or essential part; maim; disfigure." And in Webster's Dictionary we find: "To cut off or remove a limb or essential part of; to maim." In the Oxford Dictionary, volume 6, page 799, we find this definition: "To deprive (a person or animal) of a limb or some principal organ of the body; to cut off or otherwise destroy the use of (a limb or organ)." In each of these three dictionaries a second definition is given but in each case the second definition refers to the mutilation of some article such as a book or manuscript. As, for example, the second definition in the Oxford Dictionary is as follows: "To render (a thing, esp.

a record, book, etc.) imperfect by cutting off or destroying a part.''

The trial court instructed the jury as follows: "The word 'mutilate' as used in Section 290 of the Penal Code, means to destroy or remove a material part of, so as to render imperfect." The trial court erroneously used the definition of the word as applied to articles such as books and manuscripts rather than the definition which is given in all of the recognized dictionaries as applied to the human body. It is provided in Penal Code section 7, subdivision 16, that: "Words and phrases must be construed according to the context and the approved usage of the language." In none of the dictionaries, either legal or general in scope, do we find a definition of the word "mutilate" as applied to the human body which is couched in the language used by the trial court or in any similar language. Without the use of the dictionaries it would be difficult to conclude that one who removes gold crowns from the teeth of a dead body could be properly accused of mutilating the body. The evidence in the case before us shows that the natural teeth were not removed or impaired and that the only act committed was the mere removal of the crowns which had been cemented to the teeth. There was no maiming or disfigurement of the teeth or of any part of the body. It could not be successfully argued that a plate of false teeth, which is frequently removed for long periods of time, is in fact a part of the body. If two teeth should be removed from the jaw of a living person and two crowns should be fashioned by the dentist in such manner that they could be used and readily removed it could not be seriously argued that the two false teeth would become a part of the body. The argument that the placing of cement on the false teeth to make them adhere to the natural teeth would result in the false teeth becoming a part of the human body seems equally unsound. An examination of all the evidence leads to the inevitable conclusion that the crime charged in the information has not been proved.

The judgment is reversed and the bail of appellant is exonerated. Our reversal of the judgment makes the questions raised on the appeal from the order denying a new trial moot. The appeal from said order is dismissed.

Crail, P. J., and McComb, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 28, 1938.